**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**                    Case No. 2:21-cv-05017-PCK-SIL
---------------------------------------------------------------- x
NOE GONZALEZ,

Plaintiff,

              -against-

THE CHEESECAKE FACTORY RESTAURANTS,
INC. d/b/a THE CHEESECAKE FACTORY,

Defendant.
---------------------------------------------------------------- x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY AND COMPEL INDIVIDUAL ARBITRATION

In 2002 The Cheesecake Factory Restaurants, Inc. d/b/a The Cheesecake Factory ("TCFI") rolled out their Alternative Dispute Resolution ("ADR") Program, wherein TCFI and all of its employees mutually agreed to resolve disputes via individual arbitration. The Alternative Dispute Resolution Program is reduced to writing in the long-form Arbitration Agreement and is articulated in the Employee Handbook issued to every TCFI employee, including Plaintiff Noe Gonzalez and prospective Plaintiff Keith Calvagno. Gonzalez and Calvagno, like every other TCFI employee, agreed to and were subject to the ADR Program. In violation of his promise to resolve disputes via individual arbitration, Gonzalez filed suit against TCFI in this Court. In violation of his promise to resolve disputes via individual arbitration, Calvago later attempted to join this lawsuit via a proposed amended complaint. As is fully articulated below, the Court should hold Gonzalez and Calvagno to their promises, grant TCFI's motion to compel individual arbitrations and stay this matter pending the outcome of those arbitrations.

## FACTUAL BACKGROUND

Plaintiff Noe Gonzalez worked as a cook at TCFI's restaurant at the Walt Whitman Mall,

9746890v1

160 Walt Whitman Road, Huntington, New York 11746 ("Huntington Restaurant"). *See* Declaration of Barbara Lewis, ECF 18-2 at ¶ 3. Gonzalez began working at the Huntington Restaurant in April 2009. He worked there until March 2021. *Id.* Proposed Plaintiff Keith Calvagno worked as a server from March 21, 2008 through August 10, 2022 at the TCFI restaurant located in Lake Grove, New York. Declaration of Barbara Lewis, June 30, 2023, attached hereto as Exhibit 1, at ¶ 3.

**Onboarding At Time Of Hire**

All employees at TCFI restaurants in New York State complete onboarding at the start of their employment. Ex. 1 at ¶ 4. During this onboarding process, employees are provided copies of several important documents, including the Employee Handbook and, beginning in 2013, the long form version of the ADR Policy and Arbitration Agreement. *Id.* TCFI ensures that this policy of providing copies of important documents to new hires during onboarding is followed by each of its New York State restaurant locations through a series of monthly self-review audits conducted by each restaurant and annual corporate internal audits. *Id.* at ¶ 5. These audits ensure that all newly hired employees receive all onboarding documents, including the Employee Handbook and Arbitration Agreement. *Id.*

When TCFI hired Gonzalez in April 2009, he was provided with a copy of the Employee Handbook. ECF 18-2 at ¶ 4. When TCFI hired Calvagno in March of 2008, he was provided with a copy of the Employee Handbook. *Id.* at ¶¶ 4, 6, 7.

**Arbitration Agreement In Employee Handbook**

The TCFI Employee Handbook contains valuable information for employees including current TCFI policies and best practices. *Id.* at ¶ 6. The version of the Employee Handbook provided to Gonzalez in 2009 and Calvagno in 2008 contained a two-page acknowledgment form.

ECF 18-2 at ¶ 4; Ex. 1 at ¶ 6; *see also* ECF 18-2 at p. 70-71, 143-144. The acknowledgment form contains nine paragraphs. Employees are required to sign their initials next to each paragraph. ECF 18-2 at ¶ 4. At the end of the nine paragraphs is an additional acknowledgment section. *Id*. In this section, the employee is required to print their name, sign their name, provide the date and identify their restaurant location. *Id*.

The eighth paragraph of the Employee Handbook acknowledgment form (the "Arbitration Acknowledgment") states the following:

> I recognize that differences may arise between me and the Company during, or following, my employment with the Company. I agree to participate in impartial dispute-resolution proceedings as a condition of and as consideration for the offer of employment by the Company. If I, or the Company, determine that the Company's internal procedures for handling claims (including but not limited to, reporting claims to my manager, the Area Director of Operations, the CARELINE, and/or the Staff Relations Department), have not resulted in a mutually acceptable resolution of disputes between me and the Company, **I agree to participate in arbitration proceedings**.

*Id.* ¶ 5 (emphasis added). During the onboarding process, new hires are notified that the foregoing paragraph required mandatory individual arbitration for any disputes that arose during employment. *Id*; Ex. 1 at ¶ 7. Onboarding employees are also notified that their offer of employment and continued employment is expressly conditioned on them agreeing to the foregoing paragraph. ECF 18-2 at ¶ 5; Ex. 1 at ¶ 7. If an employment dispute arose and the matter went to arbitration, the parties would agree on arbitration through either AAA or JAMS with the rules of the agreed-upon forum to apply and with TCFI to pay all of the arbitration costs at its sole expense. ECF 18-2 at ¶ 5; Ex. 1 at ¶ 7.

**TCFI Provides Both An English And Spanish Language Employee Handbook**

TCFI has both an English and Spanish version of the Employee Handbook. ECF 18-2 at ¶ 6; *see also* ECF 18-2 Exhibits A and B. New hires whose primary language is Spanish are provided

3

9746890v1

the Spanish language version of the Employee Handbook.  ECF 18-2 at ¶ 6.  TCFI uses a third-party translation service to translate the Employee Handbook from English to Spanish.  *Id.*  Further, in anticipation of this Motion, TCFI engaged Walter L. Krochmal, a Federally Certified Court Interpreter and Expert Witness based in the Southern District of New York, to verify the accuracy of the translation of the Spanish version of the Employee Handbook provided to Spanish speaking employees, including Gonzalez.  *See* Exhibit 2, Certificate of Accuracy of Walter L. Krochmal. Mr. Krochmal translated the English version of the Employee Handbook acknowledgment to Spanish and compared it to the Spanish version of the Employee Handbook acknowledgment presented to Gonzalez.  *Id.*  After reviewing and comparing the English language version and the original Spanish translation version of the Employee Handbook acknowledgment, Mr. Krochmal opined that "the latter is a reasonable translation of the former."  *Id.*  The Spanish language version of the Employee Handbook acknowledgment presented to Gonzalez during his onboarding is a fair and reasonable translation of the English version, and Gonzalez cannot be said to have not understood what he was agreeing to.  *Id.*

### Gonzalez Onboarding

TCFI provided Gonzalez with a Spanish language version of the Employee Handbook acknowledgment form at the start of his employment.  ECF 18-2 at ¶ 7; ECF 18-2 Exhibit C. Gonzalez signed his initials "N.G." next to every one of the nine paragraphs—including the Arbitration Acknowledgment—and also printed his name, signed his name, provided the date, and identified his restaurant location.  *Id.*

### Calvagno Onboarding

It was TCFI policy in March 2008 and continues to be TCFI policy to present all new employees with a copy of the most current Employee Handbook, including the acknowledgment

pages.  Ex. 1 at ¶ 7.  In 2008, it was TCFI policy to inform all new hires that the Arbitration Acknowledgment required mandatory individual arbitration for any disputes that arose during the onboarding employee's employment.  *Id*.  In 2008, it was also TCFI policy to inform onboarding employees that their offer of employment and continued employment was expressly conditioned on them agreeing to the Arbitration Acknowledgment.  *Id*.  Calvagno would not have been able to begin his employment and would not have been entered into the TCFI payroll system without receiving his onboarding documents and completing his onboarding paperwork.  *Id*. at ¶ 8.

### Employee Handbook Updates

During Calvagno's employment from 2008-2022, TCFI re-issued the Employee Handbook—including the Arbitration Acknowledgment—three times.  *Id*. at ¶ 9.  In order to ensure that all employees were made aware of and could access the updated Handbook, a notice of the Handbook update was disseminated through TCFI's scheduling software, HotSchedules.  *Id*. Employees were further instructed to review a full copy of the Handbook via ScoopsLive or a hard copy from their Manager.  *Id*.  HotSchedules is the only method by which TCFI restaurant employees, including Calvagno, can access their schedule.  *Id*. at ¶ 10.  When TCFI disseminated information to employees, including Employee Handbook updates, TCFI created a notification that would appear upon first accessing HotSchedules.  *Id*.  Upon opening HotSchedules, the employee would need to read and click through the notification in order to access their schedule. *Id*. at ¶ 11.  Employees are required to affirmatively click "continue" in order to see any additional messages and then access their schedule and earnings statements.[1].  *Id*.  These notifications would, for example, announce an update to the Employee Handbook and would appear as the first screen

---

[1] Earnings statements became available both via HotSchedules and TCFI's "Self-Service" program in 2020.

on HotSchedules over multiple logins to ensure that all employees received the notification.  *Id.*; *see also* Ex. A, Sample HotSchedules Message.  In short, it would be impossible for an employee, including Calvagno, to access his or her schedule or earning statements without seeing and clicking through the home screen notification.  Ex. 1 at ¶ 11.

Three times during Calvagno's employment, TCFI placed notifications on the home screen of HotSchedules notifying employees, including Calvagno, of updates to the Employee Handbook and reminding employees the multiple ways they could access the Handbook.  *Id.* at ¶ 12.  These notifications also encouraged employees to read the Handbook and to contact their General Manager if they had questions.  *Id.*  Further, the Handbook itself reminds employees that it is their "responsibility to read and adhere to the guidelines in all material," including the Handbook.  *Id.* at ¶ 12.  Finally, during the entire period of Calvagno's employment, TCFI staff participated in a daily staff meeting called "Alignment."  *Id.* at ¶ 14.  During Alignment, management would convey restaurant information, benefits changes, company information, and celebrations to staff members.  *Id.*; *see also* Ex. B, Sample Alignment Talking Points, Ex. C, Sample Staff Member Communication.  Updates to the Employee Handbook were also conveyed during Alignment.  *Id.*

## ARGUMENT

### I.     The Court Should Stay the Case and Compel Arbitration.

Per the Federal Arbitration Act ("FAA"), the Court should stay this case and compel Gonzalez and Calvagno to single claimant arbitrations.  *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) (holding that proper procedural mechanism under the FAA is to stay case and compel arbitration). The FAA governs questions of arbitrability in both state and federal courts.

6

*See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).[2] Congress enacted the FAA to overcome judicial hostility to arbitration agreements and to express its desire that the courts rigorously enforce them. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 625 (1985). The Supreme Court has reaffirmed that under the FAA an arbitration agreement ordinarily must be treated as "valid, irrevocable, and enforceable." *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).

Under the FAA, a party to an arbitration agreement may petition a court for an order directing arbitration in the manner provided in such agreement and the court must stay proceedings pending arbitration. *See* 9 U.S.C. § 3.

Section 3 of the FAA states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

And Section 4 of the FAA states:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a

---

[2] Federal law favors arbitration as a method of resolving disputes. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56 (1995); 9 U.S.C. § 2. New York public policy also strongly favors arbitration. *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 530 (S.D.N.Y. 2003). "New York courts interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration." *Smith Barney Shearson, Inc. v. Sacharow,* 91 N.Y.2d 39, 49-50 (N.Y. 1997).

9746890v1

civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

Given Congress' strong policy favoring arbitration agreements, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008). Additionally, an employee failing to sign "the arbitration agreement is also not dispositive." *Lopez v. Lidl US, LLC*, No. 22-CV-4271 (ALC), 2023 WL 2674757, at *4 (S.D.N.Y. Mar. 29, 2023) (enforcing arbitration agreement and compelling individual arbitration in the absence of employee signature). "The critical issue is not whether the charter party was signed by the party sought to be [c]harged ... but whether there was a meeting of the minds of the parties as to the essential terms of the agreement, even though unsigned by one party." *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974); *see also Nat'l City Golf Fin. v. Higher Ground Country Club Mgmt. Co., LLC*, 641 F. Supp. 2d 196, 203 (S.D.N.Y. 2009) (Under New York Law, [c]ourts ... consistently ... require that an agreement to arbitrate be in writing but not necessarily be signed by the party to be bound.").

To stay proceedings and compel arbitration, the Court must consider four factors: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) whether Congress intended any federal statutory claims asserted to be nonarbitrable; and (4) if some, but not all, of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration. *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004). When these issues are decided in favor of arbitration, there is "no place for the exercise of discretion" and the court must direct the parties to proceed in arbitration. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218-19 (1985); *see also Feuer v. Stoler of Westbury, Inc.*, No. 20-CV-6094 (JMA) (JMW), 2021 WL 4820605, at *2 (E.D.N.Y. Oct. 15, 2021) ("The statute leaves no place for the exercise

8

of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). The burden of proving that the claims at issue are unsuitable for arbitration falls on the party opposing the motion. *Green Tree Financial Corp.-Alabama v. Randolph,* 531 U.S. 79, 91 (2000). Because all four factors are met here for both Gonzalez and Calvagno, the Court must compel arbitration.

      **1.**      **The Parties Agreed to Arbitrate.**

          **A.**      <u>Gonzalez and TCFI Agreed To Arbitrate</u>

A valid arbitration agreement exists between the Gonzalez and TCFI.[3] The agreement is in writing, the agreement was a condition of starting employment and continued employment, and Gonzalez signed the agreement not once but twice, reflecting his acknowledgment and agreement to be bound by its terms.  ECF 18-2 at ¶ 7.  The agreement's language is distinct and mandatory: it contractually requires Gonzalez to arbitrate any employment related dispute.

As the Second Circuit has held, arbitration is a matter of contract and courts must look to state contract law to determine whether a valid arbitration agreement exists. *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003). Under New York law, courts employ "[o]rdinary principles of contract and agency" to determine whether the parties have agreed to arbitrate. *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001). A party generally will be held to a signed contract unless he can demonstrate

---

[3] As noted above, TCFI informs its employees about the ADR Program and Arbitration agreement in many ways, including a long-form arbitration agreement.  The long-form agreement, however, was not disseminated during onboarding in New York until 2013, after both Gonzalez and Calvagno were hired.  Ex. 1 at ¶ 4  TCFI is therefore not moving to compel individual arbitration against Gonzalez or Calvagno based on the long-form agreement at this time. TCFI reserves its right, however, to enforce the long-form arbitration agreement against any potential putative class member.

special circumstances, such as duress or coercion, which contradicts his intent to be bound. *Arakawa v. Japan Network Group*, 56 F.Supp.2d 349, 352 (S.D.N.Y. 1999).

Here, Gonzalez signed his initials next to the arbitration agreement and printed his name, signed his name, provided the date, and identified his restaurant location at the bottom of the employee handbook acknowledgment form with the arbitration agreement. ECF 18-2 at p. 143-144. As to consideration, TCFI's offer of employment to Gonzalez and his continued employment with TCFI is sufficient consideration to enter into the arbitration agreement. *See Moorning Brown v. Bear, Stearns & Co.*, No. 99 CIV 4130 JSR HBP, 1999 WL 1063233 (S.D.N.Y. Nov. 23, 1999) (finding that a "plaintiff's promise to arbitrate is supported by [the employer]'s offer of employment to plaintiff and its continued employment of plaintiff"). So too is the parties' mutual promises to arbitrate. *See Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 104 (E.D.N.Y. 2015) ("Mutual promises to arbitrate, while not necessary as consideration to support an agreement to arbitrate, can be sufficient consideration to support an arbitration agreement."). Gonzalez cannot produce any evidence that he signed the agreement under duress or coercion. Put simply, Gonzalez accepted the arbitration agreement and agreed to be bound by its terms.

To the extent Gonzalez argues that the language in the arbitration agreement is insufficient to mandate arbitration, multiple federal courts have reviewed the specific language the Arbitration Acknowledgment and ruled that it does indeed require arbitration. *See, e.g.*, *EEOC v. Cheesecake Factory, Inc.*, No. CV08-1207PHXNVW, 2009 WL 1259359, at *6 (D. Ariz. May 6, 2009) ("The Arbitration Agreement is neither procedurally nor substantively unconscionable…. The FAA, therefore, mandates compelling arbitration of Fitzpatrick's and Miller's claims."); *Sedelnikova v. The Cheesecake Factory Rest., Inc.*, No. CIV. A. AW-09-2398, 2010 WL 2367387, at *2 (D. Md. June 7, 2010) ("[T]he Court believes the provision qualifies as a valid agreement to arbitrate as

9746890v1

the agreement was made with valid consideration, mutual assent and no fatal unconscionability.");

*Smith et. al. v. The Cheesecake Factory Restaurants, Inc. et. al.*, No. 3:06-00829 (Doc. No. 107), at 17 (M.D. Tenn. Feb. 3. 2010) (ordering Plaintiffs to arbitrate their FLSA claims with TCFI based on the exact same language that Mr. Gonzalez signed).

New York federal court rulings are in accord with these decisions. *See, e.g.*, *Patterson v. Raymours Furniture Co., Inc.*, 96 F.Supp.3d 71, 76 (S.D.N.Y. 2015) ("Under New York law, a party who signs a written contract is conclusively presumed to know its contents and to assent to them, and he is therefore bound by its terms and conditions. With regards to arbitration agreements in the employment context, courts in this district routinely uphold arbitration agreements contained in employee handbooks where the employee has signed an acknowledgment form.") (citing *Chanchani v. Salomon/Smith Barney, Inc.*, No. 99–CV–9219 (RCC), 2001 WL 204214, *3 (S.D.N.Y. Mar. 1, 2001) ("Courts in this district routinely uphold arbitration agreements contained in employee handbooks where, as here, the employee has signed an acknowledgment form."); *Litvinov v. UnitedHealth Grp. Inc.*, No. 13–CV–8541 (KBF), 2014 WL 1054394, *3 (S.D.N.Y. Mar. 10, 2014) (finding that the parties agreed to arbitrate and that the employee "electronically acknowledged that she received and reviewed the Arbitration Policy" of her employer); *Beletsis v. Credit Suisse First Boston, Corp.*, No. 01–CV–6266 (RCC), 2002 WL 2031610, *3 (S.D.N.Y. Sep. 4, 2002) (holding that the parties agreed to arbitrate and that the employee "signed the Compliance Certification" that referred to the employer's arbitration program); *Arakawa v. Japan Network Grp.*, 56 F.Supp.2d 349, 352 (S.D.N.Y.1999) ("[T]he parties' agreement to arbitrate is evidenced by the Employee Handbook and the Acknowledgment signed by plaintiff.")). Further, as is noted above, the Spanish language translation of the Employee Handbook acknowledgment pages, including the Arbitration Acknowledgment, was a "reasonable translation." Ex. 2,

Krochmal Certificate of Accuracy.  TCFI provided Gonzalez with a fair and accurate translation and Gonzalez cannot be said to have not understood what he was agreeing to.  *Id*.  Accordingly, as to Gonzalez, the first factor of the four-factor arbitration test is met.

B.   Calvagno and TCFI Agreed To Arbitrate

As was the case with Gonzalez, TCFI also presented Calvagno with the Employee Handbook and the Handbook acknowledgment section—including the Arbitration Acknowledgment—at the time of his hire.  Ex. 1, Lewis Decl. at ¶¶ 4, 6, 7.  Further, as was the case with Gonzalez, TCFI informed Calvagno during his onboarding that his offer of employment and continued employment was expressly conditioned on him agreeing to the Arbitration Acknowledgment.  *Id*. at ¶ 7.  Just like Gonzalez, Calvagno would not have been able to begin his employment and would not have been entered into the TCFI payroll system without receiving his onboarding documents and completing his onboarding paperwork.  *Id*. at ¶ 8.  And finally, as with Gonzalez, TCFI provided Calvagno with three updates to the Employee Handbook via HotSchedules.  *Id*. at ¶ 9.  Calvagno could not have accessed his schedule (which of course he did because he continued to know when to show up to work) and earnings statements without seeing the messages from TCFI regarding the updated Handbook and reminding him to read the Handbook and that his employment was conditioned on him agreeing to and following the policies in the Handbook.  *Id*.  at ¶¶ 10-11; *see also* Exhibit D, Sample of Calvagno HotSchedules Logins related to Employee Handbook Updates.  The only differences between Gonzalez and Calvagno regarding arbitration are (i) English is Calvagno's preferred language, so Calvagno received and reviewed the Handbook in English, and (ii) TCFI has misplaced the Arbitration Acknowledgment initialed and signed by Calvagno.  As the Second Circuit holds, however, this Court should still find that Calvagno and TCFI agreed to arbitrate their claims and enforce the arbitration agreement

12

found in the Arbitration Acknowledgment. *Brown v. St. Paul Travelers Companies, Inc.*, 331 F. App'x 68 (2d Cir. 2009) (enforcing arbitration agreement found within employee handbook despite employee not signing handbook receipt because it was employee's responsibility to read and understand company policy).

It is the "established law of this circuit that a party may be bound by an agreement to arbitrate even in the absence of a signature." *Id*. *See also McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519, 524 (2d Cir.1980) ("Such a conclusion, however, would be directly contrary to the established law of this circuit that a party may be bound by an agreement to arbitrate even in the absence of a signature."); *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974); *Fisser v. Int'l Bank*, 282 F.2d 231, 235 (2d Cir. 1960). "Under New York law, the conduct of the parties may lead to the inference of a binding agreement: A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct." *Brown*, 331 F. App'x 68. Importantly, a contract implied in fact "is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Id*. (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 582 (2d Cir.2006)). Here, Calvagno's conduct and TCFI's conduct and policies make clear that, despite TCFI's inability to locate Calvagno's signature page, Calvagno and TCFI mutually agreed to resolve disputes via individual arbitration. A thorough analysis of *Brown*, where the Second Circuit enforced an arbitration agreement implied in fact, is instructive here:

- The arbitration agreement at issue in *Brown* was contained in the employee handbook;
  - o Here the arbitration agreement at issue here is contained in the Employee Handbook. ECF 18-2 at p. 70-71, 143-144.

13

- Plaintiff in *Brown* claimed she never signed the employee handbook receipt form and that she never received a handbook;
  - Here, TCFI is unable to locate Calvagno's signed employee handbook receipt form.

- Employer in *Brown* provided all employees with an employee handbook at the start of their employment with the company;
  - Here, TCFI also provides all employees with the Employee Handbook at the start of their employment.  Ex. 1, Lewis Decl., at ¶¶ 4, 7.

- Employer in *Brown* revised and redistributed the employee handbook five times during the course of plaintiff's employment;
  - Here, TCFI revised and redistributed the Employee Handbook three times during Calvagno's employment.  *Id*. at ¶ 9.

- Employer in *Brown* sent an e-mail to all employees advising them it was their responsibility to read and understand the handbook and that compliance with the handbook was a condition of employment;
  - Here, TCFI notified Calvagno via at least four separate HotSchedules messages that he must read the Employee Handbook and that compliance with the Employee Handbook was a condition of employment.  *Id.* at ¶ 11; *see also* Ex. D, HotSchedules Login Data.

- Plaintiff in *Brown*, despite repeated notifications about the arbitration policy, continued her employment.
  - Here, despite repeated notifications about the arbitration policy, Calvagno continued his employment.  *Id*. at ¶ 3.

*See Brown*, 331 F. App'x 68 at *1.

Just as in *Brown*, Calvagno's "continued employment after [] repeated notifications [about the arbitration agreement] lends force to the presumption that [he] agreed to be bound to the arbitration policy."  *Id*.  Simply claiming that he "has no recollection or record of receiving the employee handbook and arbitration policy, despite the fact that it was distributed on at least six occasions during [his] employment, is ... not sufficient to raise a genuine issue of material fact" and not sufficient to release Calvagno from his promise to arbitrate disputes with TCFI.  *Id*.  Accordingly, as the Second Circuit found in *Brown*, the Court should find that TCFI and Calvagno agreed to arbitration their disputes.

9746890v1

**2.      An NYLL Wage Frequency Claim Falls Within The Scope Of The Arbitration Agreement.**

Gonzalez and Calvagno's pay frequency claims fall within the scope of the arbitration agreement. The agreement refers to "differences" that "may arise between [Plaintiff] and [TCFI] during, or following, [his] employment with [TCFI]." ECF 18-2 at p. 71.  The agreement then states that Gonzalez and Calvagno will "participate in impartial dispute-resolution proceedings as a condition of and as consideration for the offer of employment by [TCFI]."  *Id*.  Finally, the agreement provides that if Gonzalez and Calvagno or TCFI "determine that [TCFI's] internal procedures for handling claims" do not result "in a mutually acceptable resolution of disputes between [Gonzalez or Calvagno] and [TCFI]," Gonzalez and Calvagno will "participate in arbitration proceedings." *Id*.

As three courts have already held, the arbitration agreement "plainly gives notice that the 'differences,' 'claims,' and/or 'disputes' to be resolved through arbitration are those related to employment by [TCFI]." *EEOC*, 2009 WL 1259359, at *6 (finding that the plaintiffs' claims fell within the scope of TCFI's arbitration agreement); *accord Sedelnikova*, 2010 WL 2367387, at *7 (adopting the Arizona federal district court's reading of TCFI's arbitration agreement and finding that it is "broad" and "provides that any dispute will be covered"); *Smith*, No. 3:06-00829 (Doc. No. 107) (M.D. Tenn. Feb. 3, 2010) (concluding that the plaintiffs' FLSA claims "concern disputes in the course of their employment with [TCFI]").

Gonzalez and Calvagno's pay frequency claims are related to one of the most, if not the most, essential components of their employment with TCFI: the payment of wages and more specifically how often their wages are paid. Because Gonzalez and Calvagno's claims are related to their employment with TCFI, they fall within the scope of the arbitration agreement. *See*

*Sutherland v. Ernst & Young, LLP*, 726 F.3d 290, 293 (2d Cir. 2013) (holding that FLSA and NYLL compensation claims were subject to arbitration based on an arbitration agreement where the parties agreed that "employment related dispute[s]" were subject to arbitration).

Given the clear and broad language in the arbitration agreement stating that all employment related differences, claims, and/or disputes are subject to arbitration, Gonzalez and Calvagno cannot overcome the "presumption of arbitrability" and provide a "positive assurance" that the agreement "is not susceptible of an interpretation that covers the asserted dispute." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 395 (2d Cir. 2015); *see also Sunbelt Beverage Corp. v. Goldring*, 205 F.3d 1324 (2d Cir. 2000) ("Given the strong federal policy favoring arbitration as an alternative means of dispute resolution, we construe arbitration clauses as broadly as possible, and we resolve all doubts in favor of arbitrability. A contract's broad arbitration clause creates a presumption in favor of arbitrability.") (internal quotation marks and citations omitted). Accordingly, the second factor of the four-factor arbitration test is met.

### 3. An NYLL Wage Frequency Claim Is Arbitrable.

Arbitration agreements must be enforced with respect to statutory claims unless the "FAA's mandate has been overridden by a contrary congressional command." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). No such "contrary congressional command" exists in the FLSA wage and hour context. *Sutherland*, 726 F.3d at 296. The Second Circuit and courts within the Second Circuit have held that not only FLSA claims but also their corresponding state wage claims, such as those brought by Gonzalez and Calvagno in this lawsuit, are arbitrable. *Id.*; *see also Raniere v. Citigroup, Inc.*, 533 Fed. App'x 11, 13 (2d Cir. 2013) (requiring arbitration of FLSA and NYLL claims); *Michel v. Parts Auth., Inc.*, No. 15-CV-5730, 2016 WL 5372797, at *4 (E.D.N.Y. Sept. 26, 2016) (compelling arbitration of NYLL claims); *Bynum v. Maplebear Inc.*,

No. 15-CV-6263, 2016 WL 5373643, at *11 (E.D.N.Y. Sept. 19, 2016) (compelling arbitration of FLSA and NYLL claims); *Ciago v. Ameriquest Mortgage Co.*, 295 F.Supp.2d 324, 334 (S.D.N.Y. 2003) (compelling arbitration of FLSA and NYLL claims); *Metzler v. Harris Corp.*, No. 00-cv-5847, 2001 WL 194911, at *2 (S.D.N.Y. Feb. 26, 2001) (compelling arbitration of NYLL claims). Because neither Congress nor the New York State Legislature exempted NYLL pay frequency claims from arbitration and courts in this District routinely compel such claims to arbitration, the third factor of the arbitration test is met. Further, there is no need not address the fourth factor because Plaintiff brings one claim, which is arbitrable. For these reasons, the Court must compel arbitration and stay the proceedings pending the outcome of the arbitration.

## II.      The Court Should Compel Individual Arbitration.

### A.      Class Arbitrability Is a Gateway Issue for the Court to Decide.

Cases from the Supreme Court, federal courts of appeal, and district courts in the Second Circuit all show that the arbitrability of a class action is a gateway issue for the Court, and not an arbitrator, to decide.

Although the Supreme Court has not explicitly decided the issue, its opinions in *Stolt-Nielsen v. AnimalFeeds Intl. Corp.*, 559 U.S. 662 (2010), *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564 (2013), and *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407 (2019), have implicitly stated that arbitrability of class actions is a gateway matter for courts to rule upon.

In *Stolt-Nielsen*, the arbitration clause was silent with respect to class arbitration. *Id.* at 666. The arbitration panel decided that class arbitration was appropriate and the company appealed, asserting that the panel's opinion impermissibly imposed its own view on the arbitrability of a class action. *Id.* at 669. The Supreme Court explained that "it cannot be presumed the parties consented to classwide arbitration by simply agreeing to submit their disputes to an arbitrator." *Id.*

17

at 685. In reaching its holding, the Court relied on the "fundamental" difference between bilateral and classwide arbitration. *Id.* at 686. First, arbitrator's putative benefits of "lower costs, greater efficiency and speed" are much less certain in classwide arbitration because arbitrating class claims inevitably makes the process slower, more costly, and more likely to generate procedural chaos than final judgment. *Id.* at 685. Second, classwide arbitration does not follow the same confidentiality rules as individual arbitrations, "thus potentially frustrating the parties' assumptions when they agreed to arbitrate." *Id.* at 686. Third, while the stakes of classwide arbitration are similar to class action litigation, the scope of judicial review is severely limited. *Id.* at 686-87. Finally, there are due process concerns with class action arbitration namely that "[t]he arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well." *Id.* at 686. In light of these concerns, "the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration." *Id.* at 685-86. So *Stolt-Nielsen* is a clear indication that class arbitration is fundamental rather than procedural: absent an express agreement to allow an arbitrator to decide class arbitrability (which is not present here), this question must be reserved for a court. *Id.* at 687.

The Supreme Court in *Oxford Health* revisited the issue of whether a class arbitration presents a gateway question for a court to answer. While the Supreme Court said that it had not yet decided whether the availability of class arbitration is a question of arbitrability and that the facts in *Oxford Health* did not provide it with an opportunity to do so, the Supreme Court did note that it "would face a different issue if Oxford had argued below that the availability of class arbitration is a so-called 'question of arbitrability.'" *Id.* at 569 n. 2. The Supreme Court noted that such questions of arbitrability are presumptively for courts to decide. *Id.* In other words, the

Supreme Court instructed that if a party wishes to raise the issue of the arbitrability of a class action, it must (as TCFI is doing here) raise the issue with the court before submitting the question to an arbitrator. *Id.*

Finally, in *Lamps Plus*, although the Supreme Court declined to explicitly address whether the availability of class arbitration is a gateway question for the Court, it did reaffirm its holdings in *Stolt-Nielsen* and recognized that there are several fundamental differences between class arbitration and individual arbitration such that "*courts may not infer consent to participate in class arbitration absent an affirmative contractual basis for concluding that the party *agreed* to do so.*" *Id.* at 1416 (italics added on first word).

Although the Second Circuit has not yet ruled on the issue, every federal court of appeal that has faced the issue has said unequivocally that class arbitration is a gateway issue for a court to decide. *See Opalinski v. Robert Half Int'l.*, 761 F.3d 326, 335 (3d Cir. 2014) (finding "that the availability of class arbitration is a 'question of arbitrability'"); *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 873 (4th Cir. 2016) (concluding "that whether an arbitration clause permits class arbitration is a gateway question of arbitrability for the court"); *20/20 Commc'ns, Inc. v. Crawford*, 930 F.3d 715, 718-719 (5th Cir. 2019) ("We agree with our sister circuits and hold today that class arbitrability is a gateway issue for courts, not arbitrators, to decide, absent clear and unmistakable language to the contrary."); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) ("We therefore hold that the question whether an arbitration agreement permits classwide arbitration is a gateway matter, which is reserved for judicial determination unless the parties clearly and unmistakably provide otherwise."); *Herrington v. Waterstone Mortg. Corp.*, 907 F.3d 502, 507 (7th Cir. 2018) ("But every federal court of appeals to reach the question has held that the availability of class arbitration is a question of arbitrability. We agree."); *Catamaran*

*Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 972 (8th Cir. 2017) ("After considering all of these fundamental differences, we conclude that the question of class arbitration belongs with the courts as a substantive question of arbitrability."); *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1065-66 (9th Cir. 2020) ("Faced with whether class arbitration is a gateway question here, we see no reason to create an unnecessary circuit split, or to depart from what we have already suggested."); *JPay, Inc. v. Kobel*, 904 F.3d 923, 935-36 (11th Cir. 2018) ("We hold that the availability of class arbitration is a question of arbitrability, presumptively for a court to decide, because it is a gateway question that determines what type of proceeding will determine the parties' rights and obligations.").

District courts in the Second Circuit have reached the same conclusion. *Thompson v. Body Sculpt Int'l, LLC*, No. 18-CV-1001-ARR-GRB, 2018 WL 3235545, at *7 (E.D.N.Y. July 2, 2018) (ruling that the parties must engage in bilateral arbitration rather than classwide arbitration); *Anwar v. Fairfield Greenwich Ltd.*, 950 F. Supp. 2d 633, 639 (S.D.N.Y. 2013) (holding that whether matter can proceed as a class is a gateway dispute for the court to decide); *Chen-Oster v. Goldman, Sachs & Co.*, 785 F. Supp. 2d 394, 404 (S.D.N.Y. 2011) (holding that "*Stolt-Nielsen* opened the door to judicial determination of the issue" of whether parties agreed to class arbitration), *overruled on other grounds sub nom. Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483 (2d Cir. 2013); *Safra Nat'l Bank v. Penfold Inv. Trading, Ltd.*, No. 10 Civ. 8255, 2011 WL 1672467, at *3 (S.D.N.Y. April 20, 2011) ("*Stolt-Nielsen* held that, absent an agreement to arbitrate on a class basis, the availability of class arbitration is a gateway issue to be decided by the courts.")

Were this Court to compel individual arbitration without deciding whether class arbitration is available, the same issues and concerns raised by the Supreme Court would be present. TCFI would be denied the benefits of the individual arbitration contemplated in the arbitration

20

agreement: lower costs, great efficiency, and speed. TCFI would also have less confidentiality in a class arbitration as compared to a bilateral arbitration. There would be due process concerns as well: the arbitrator's award would bind not only the parties but also hundreds of absent class members. When TCFI drafted the arbitration agreement, it did not contemplate that a single arbitrator would make such an impactful decision covering a large class of restaurant employees in New York State. The other due process concern is the fact that Gonzalez and Calvagno's NYLL claim could proceed on an opt-out class basis. As Justice Alito said in his concurring opinion in *Oxford Health*, "where absent class members have not been required to opt in, it is difficult to see how an arbitrator's decision to conduct class proceedings could bind absent class members who have not authorized the arbitrator to decide on a classwide basis which arbitration procedures are to be used."

Given these critical and fundamental differences between an individual arbitration and classwide arbitration, the Court should find that the availability of classwide arbitration is a gateway issue for the Court, and not an arbitrator, to decide—particularly here where the parties intended to arbitrate on an individual basis.

**B.      Classwide Arbitration Is Not Available Here.**

The Supreme Court has held that the "first principle" underscoring all of its arbitration decisions is that "[a]rbitration is strictly a matter of consent" and so the parties' intentions control. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Here, the plain language in the Arbitration Acknowledgment indicates that the parties intended arbitration to proceed on an individual basis only. The Arbitration Acknowledgment uses the singular pronoun "I" four times indicating that Gonzalez and Calvagno were agreeing to arbitration on behalf of themselves only and not on behalf of any other TCFI employee. *See Chico v. Hilton Worldwide, Inc.*, No. CV 14-

21

5750-JFW SSX, 2014 WL 5088240, at *12 (C.D. Cal. Oct. 7, 2014) (finding that there was "no contractual or other basis for concluding that the parties agreed to class-wide arbitration" because the arbitration agreement "repeatedly refer to Plaintiff in the singular"); *Chesapeake Appalachia, LLC v. Scout Petroleum*, LLC, 809 F.3d 746, 760 (3d Cir. 2016) (holding that arbitration provision did not clearly and unmistakably provide for class arbitration because singular terms were used to refer to the parties). The agreement also indicates that it is bilateral in nature: the only parties referenced in the arbitration agreement are Gonzalez and TCFI and Calvagno and TCFI. The agreement makes "no reference to employee groups, putative class members, other employees, or other employees' claims or disputes." *Chico*, 2014 WL 5088240, at *12. Nor does it make reference to class actions, collective actions, representative actions, or the like. So there is no doubt that Gonzalez and TCFI and Calvagno and TCFI intended for the arbitration of employment related disputes to be individual and not classwide.

To the extent Gonzalez and Calvagno contend that the arbitration agreement is silent or ambiguous on whether classwide arbitration is available, TCFI "may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Lamps Plus*, 139 S. Ct. at 1412 (emphasis in original). "Silence is not enough." *Id.* at 1416. And like silence, "ambiguity does not provide a sufficient basis to conclude that parties to an arbitration agreement agreed to sacrifice the principal advantage of arbitration." *Id.* (internal quotation marks and alteration omitted). Accordingly, even assuming the arbitration agreement is silent or ambiguous as to the availability of classwide arbitration—which it is not—, neither silence nor ambiguity is grounds for compelling TCFI to classwide arbitration. *Id.* Instead there must be clear and unmistakable language demonstrating that Gonzalez and TCFI or Calvagno and TCFI *agreed* to classwide arbitration. *Id.* at 1412. That language is not present here. And so TCFI cannot

be forced into classwide arbitration and deprived of "the virtues Congress originally saw in arbitration" *Id.* at 1416.

## CONCLUSION

This Court should follow the other courts who have reviewed TCFI's arbitration agreement in its Employee Handbook acknowledgment form and stay this case and compel Gonzalez and Calvagno to individual arbitrations. The Court should compel Gonzalez and Calvagno to individual rather than classwide arbitrations because the arbitration agreement shows the parties' intent to arbitrate employment related disputes on a strictly individual basis.

Dated: June 30, 2023

Respectfully submitted,

*/s/ James M. Coleman*
James M. Coleman (*pro hac vice*)
Jason D. Friedman (*pro hac vice*)
Constangy, Brooks, Smith & Prophete, LLP
12500 Fair Lakes Circle, Suite 300
Fairfax, Virginia, 22033
jcoleman@constangy.com
jfriedman@constangy.com
Phone:  571-522-6111

Timothy Barbetta
Constangy, Brooks, Smith & Prophete LLP
175 Pearl Street, Suite C-402
Brooklyn, New York 11201
Telephone: (646) 341-6554
Facsimile: (646) 341-6543
tbarbetta@constangy.com

**ATTORNEYS FOR DEFENDANT**

9746890v1

<u>**CERTIFICATE OF SERVICE**</u>

I certify that the **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY CASE AND TO COMPEL INDIVIDUAL ARBITRATION** was sent to Counsel for Plaintiffs on June 30, 2023 via Electronic Mail:

> Steven J. Moser, Esq.
> MOSER LAW FIRM, P.C.
> 5 East Main Street
> Huntington, NY 11743
> Steven.moser@moserlawfirm.com

<u>*/s/ James M. Coleman*</u>
James M. Coleman

9746890v1